United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PIERRE LEONARD PAGE,

    Petitioner,

v.

JAMES YATES, Warden,

    Respondent.
                                 /

No. C 10-1545 CRB (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This is a federal habeas corpus action filed pursuant to 28 U.S.C. § 2254 by a pro se state prisoner. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

In 2008, a Monterey County Superior Court jury found petitioner guilty of forcible rape and sexual battery with restraint, and petitioner admitted to allegations that he had suffered a prior strike and a serious felony conviction. Consequent to the verdicts and admissions, the trial court sentenced petitioner to a total term of 17 years in state prison. Petitioner filed the instant federal habeas petition after being denied relief from the verdicts

on direct state review.[1] Evidence presented at trial shows that in 2007, petitioner raped A., a female adult petitioner knew from college, and with whom he had had several prior consensual sexual encounters. (Ans., Ex. 6 at 2–5.) Both A. and petitioner testified at trial.

As grounds for federal habeas relief, petitioner alleges that (1) the prosecutor's peremptory challenge to a prospective juror was exercised for racially discriminatory reasons; and (2) the trial court's denial of petitioner's motion for a mistrial after a witness mentioned that petitioner was on probation for burglary violated his due process and Fifth Amendment rights.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at

---

[1] The state appellate court affirmed the criminal judgments, but remanded the action for reconsideration of the trial court's calculation of petitioner's fines. (Ans., Ex. 6 at 29.)

413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

## DISCUSSION

### I.   Prosecutor's Use of a Peremptory Challenge

Petitioner claims that the trial court violated his Equal Protection rights by denying his motion opposing the prosecutor's use of her peremptory strikes to exclude prospective Juror 3, an African-American, on grounds of race. (Pet., P. & A. at 6.) Petitioner specifically contends that he "fails to see any meaningful distinction between the responses of Prospective Juror 3 and Prospective Juror 7," who was not African-American and who was seated on the jury. (Id. at 13.) Put another way, petitioner contends that a comparative juror analysis of the responses given by Juror 3 and those given by Juror 7 shows that the prosecutor's reasons for striking Juror 3 were pretextual.[2]

The relevant facts, as given by the state appellate court, are as follows:

> Voir dire revealed that Prospective Juror 3 was a retired female food service worker who had completed only the eighth grade. She had difficulty seeing without her glasses, which she was not wearing during voir dire. Prospective Juror 3 had served on a jury twice before but could only recall one of those cases, a civil case. She said that serving as a juror would "just [be] interfering with my golf game." Prospective Juror 7 was a female fire captain paramedic who worked professionally with a lot of police officers. She had served on two prior juries in criminal cases. Prospective Juror 6 was a female nurse.
>
> When the prosecutor questioned the prospective jurors, she inquired whether "there is anyone here who does not think it's sufficient to say no, that they feel that a woman must physically resist?" [Prospective Juror 8], a female prospective juror who had been sexually assaulted 20 years earlier, responded to the prosecutor's inquiry by mentioning "a case somewhere in the nation"

---

[2] The circumstances of Juror 6's voir dire form no part of petitioner's federal habeas claim, though the state appellate court thoroughly considered such circumstances in its written opinion of petitioner's Batson claim.

where there was "consensual sex and halfway through she said no, and he continued, and so, he's — this man is up on rape charges." The prosecutor asked her what she thought about that, and she said she "d[id]n't know" and "[i]t's a tough one." Prospective Juror 8 elaborated that she was "not sure" whether that was rape and "would have to hear more about that case" to decide. The prosecutor then asked Prospective Juror 6 "what do you think about the scenario that [Prospective Juror 8] talked about?" Prospective Juror 6 responded: "Again, you know, like I would have to hear more. I mean saying no and doing what at the same time. I mean, you know, is it saying no, do you have to be physical? If you're saying no and pulling somebody on top of you or you know what I mean? I need more information than just saying no. Like the situation or whatever."

The prosecutor asked Prospective Juror 3 "what are your thoughts on this issue?" She responded: "Well, my thoughts [sic] is a lot of times when someone says no, they don't mean no. They can just, you know, it can go both ways." "Well, a lot of times women say no and they don't mean no. And so — [.]" The prosecutor asked: "And so would it not be, then, enough for you if a woman had said no, you would require more than that to decide it?" This colloquy ensued: "[Prospective Juror 3]: It all depends on how she says it. [The Prosecutor]: So, how would she need to say it? [Prospective Juror 3]: Forceful. [The Prosecutor]: Forceful? [Prospective Juror 3]: Yes. That's right. I mean no. Stop. You know? [The Prosecutor]: And that would be enough for you? [Prospective Juror 3]: Yes. That would be enough for me."

Next, the prosecutor asked Prospective Juror 7 "what are your thoughts on that?" This colloquy followed: "[Prospective Juror 7]: I think I would have to hear all the information. [The Prosecutor]: Generally, do you feel that words are enough or do you feel that a woman has to, say, hit or kick or something of that sort? [Prospective Juror 7]: I think the words could be enough if they were forcefully with intent said. [The Prosecutor]: What do you mean 'with intent'? [Prospective Juror 7]: Meaning no. [The Prosecutor]: Meaning no? So you don't think that no always means no? [Prospective Juror 7]: No. Not necessarily. [The Prosecutor]: Under what circumstances do you think it doesn't mean no? [Prospective Juror 7]: I don't know. A lot of different circumstances no doesn't mean no. [The Prosecutor]: Well, in the circumstances of two individuals regarding sexual intercourse. [Prospective Juror 7]: I think you need to say no in a forceful way."
. . . .

The prosecutor thereafter exercised a peremptory challenge to Prospective Juror 3. [Petitioner's] trial counsel[3] contested the challenge under Wheeler/Batson.[4] The court noted that both [petitioner] and Prospective Juror 3 were African-American, and that Prospective Juror 3 was the sole African-American on the current panel, although "there appears to be one or

---

[3] The state appellate court noted that petitioner had two trial attorneys, but "found it unnecessary . . . to differentiate between them." (Ans., Ex. 6 at 17 n.10.)

[4] In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion under People v. Wheeler, 22 Cal. 3d 258, 280 (1978).

more African American panelists remaining that have not been called." [Petitioner's] trial counsel said he did not "see any race neutral reason to strike" Prospective Juror 3. The trial court found, "[u]nder the demographic circumstances . . . that there has been an adequate prima facie showing to invite any response or comments from [the prosecutor]." The prosecutor responded: "Upon my questioning, [Prospective Juror 3] indicated that sometimes no meant no and sometimes it meant yes. And that she would need evidence that it was forcefully said, the fact that no was said, no would not be sufficient for her on its face. Further, during questioning, not only of her but the other jurors in questioning them in the group, there were times I felt she was scowling at me, didn't seem particularly engaged with me. I felt she did not connect with me as an attorney. That's why I challenged her."

The trial court verified the accuracy of the prosecutor's recounting of Prospective Juror 3's responses to questioning about the meaning of no and the need for "a certain level of forceful communication of that lack of consent." The court asked [petitioner's] trial counsel to respond. [Petitioner's] trial counsel contended that Prospective Juror 3's responses were neutral between the prosecution and the defense because she had stated "a true proposition." The court responded: "I don't know how it is not race neutral that a prosecutor in a case with facts of this type would [not] want to leave someone on the jury who says sometimes no does not mean no." The court noted that "what we're talking about is whether there is race neutral basis for the exercise of a preemptory not having to do with implicit bias or any cause standard." It found that the prosecutor "has advanced a race neutral justification for excusing [Prospective Juror 3] in this context." The court denied [petitioner's] motion.

FN9. The court made no finding regarding the validity of the prosecutor's assertion that Prospective Juror 3 had been "scowling" at her.

After he was convicted, [petitioner] moved for a new trial on the ground that Prospective Juror 3 had been dismissed for a racially discriminatory reason. At the hearing on the motion, [petitioner's] trial counsel argued: "After we delved into the transcript, we found two other jurors who made almost identical statements to the African-American juror who was struck by the District Attorney. And the two white females were left on the jury and not struck." The prosecutor argued that the two other jurors "did not make identical statements." The court denied the motion. "I think there is an appropriate basis again demonstrated by the prosecutor for exercising the challenge and find that it was not improperly exercised purely on the basis of protected class membership."

(Ans., Ex. 6 at 8–11) (one footnote and all paragraph marks removed).

The state appellate court rejected petitioner's claim:

[Petitioner] argues that the voir dire responses of Prospective Jurors 3, 6, and 7 were "substantively identical" on the question of whether "no meant no." He argues: "[B]ecause the record reflects essentially similar responses by an excused minority panelist and two seated, non-minority [panelists], the prosecutor's insistence that differences existed where none can be discerned could only have been viewed as insincere . . ."

> We disagree with [petitioner's] claim that the voir dire responses of these three prospective jurors were "substantively identical." Prospective Juror 3 repeatedly expressed the belief that "*a lot of times* women say no and they don't mean no." (Italics added.) Prospective Juror 7's comments were less emphatic and more limited. She stated that no did "[n]ot necessarily" mean no, and, when asked when no did not mean no, she replied that there were "[a] lot of different circumstances [where] no doesn't mean no." Nothing in Prospective Juror 7's comments indicated that she believed that women "a lot of times . . . say no and they don't mean no." Prospective Juror 6's comments were even more distinguishable from those of Prospective Juror 3. She simply suggested that a person's "physical" actions might contradict the person's "saying no" if the verbal statement occurred at same time as the person was "pulling somebody on top of" the person. The prosecutor, and the court, could have reasonably concluded that Prospective Juror 6's comments did not indicate that she thought women "a lot of times . . . say no and they don't mean no."
>
> Because the voir dire responses of Prospective Juror 3 on this issue were more adverse toward the prosecutor's case than those of Prospective Juror 7 and Prospective Juror 6, a comparative analysis of those responses does not provide substantial support for a finding of discriminatory intent. A comparative analysis also should not be limited to those responses alone. Because an attorney does not "evaluate panelists based on a single answer," the trial court's, and our, evaluation of the credibility of the prosecutor's race-neutral justification must also take into account "other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable." [Citation removed.] Here, Prospective Juror 3 was a retired non-professional woman with little education and poor eyesight, while Prospective Jurors 6 and 7 were employed as a nurse and as a paramedic. A prosecutor might legitimately believe that the nature of their professions made Prospective Jurors 6 and 7 more desirable jurors notwithstanding their responses regarding the meaning of "no."
>
> As we must "presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses" [citation removed], we can only conclude on this record that the evidence supports the trial court's finding that the prosecutor's nondiscriminatory justification for her challenge to Prospective Juror 3 was credible. Hence, the trial court did not err in denying [petitioner's] <u>Wheeler/Batson</u> motion.

(Ans., Ex. 6 at 14–15.)

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. See <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986). <u>Batson</u> permits prompt rulings on objections to peremptory challenges pursuant to a three-step process. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts

1 gives rise to an inference of discriminatory purpose." Id. at 93–94.  Second, if the requisite
2 showing has been made, the burden shifts to the prosecutor to articulate a race-neutral
3 explanation for striking the jurors in question.  Id. at 97; Wade v. Terhune, 202 F.3d 1190,
4 1195 (9th Cir. 2000).  Finally, the trial court must determine whether the defendant has
5 carried his burden of proving purposeful discrimination.  Batson, 476 U.S. at 98; Wade, 202
6 F.3d at 1195.  A federal habeas court need not dwell on the first step of the Batson analysis if
7 the matter has proceeded to the second or third step.  "Once a prosecutor has offered a
8 race-neutral explanation for the peremptory challenges and the trial court has ruled on the
9 ultimate question of intentional discrimination, the preliminary issue of whether the
10 defendant has made a prima facie showing becomes moot."  Hernandez v. New York, 500
11 U.S. 352, 359 (1991).

12 In evaluating an explanation of racial neutrality, the court must keep in mind that a
13 proof of discriminatory intent or purpose is required to show a violation of the Equal
14 Protection Clause, see Hernandez, 500 U.S. at 355–62, and that a finding of discriminatory
15 intent turns largely on the trial court's evaluation of the prosecutor's credibility, Rice v.
16 Collins, 546 U.S. 333, 340–42 (2006).  To fulfill its duty, the court must evaluate the
17 prosecutor's proffered reasons and credibility in light of the totality of the relevant facts,
18 using all the available tools including its own observations and the assistance of counsel.
19 Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004).  A legitimate reason "is not a reason
20 that makes sense, but a reason that does not deny equal protection."  Purkett v. Elem, 514
21 U.S. 765, 769 (1995).  What matters is the "genuineness of the motive" behind the racially-
22 neutral explanation, not "the reasonableness of the asserted nonracial motive."  Id.  "To
23 accept a prosecutor's stated nonracial reasons, the court need not agree with them.  The
24 question is not whether the stated reason represents a sound strategic judgment, but whether
25 counsel's race-neutral explanation for a peremptory challenge should be believed."  Gaston
26 v. Curry, No. 07-55983, 2010 WL 5175191, at *1 (9th Cir. December 15, 2010) (quoting
27 Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006)).
28

AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Felkner v. Jackson, No. 10-797, 2011 WL 940865, at *3 (U.S. March 21, 2011) (quoting Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, see Elem, 514 U.S. at 769, as are the findings of the state appellate court, see Mitleider, 391 F.3d at 1050; Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. Miller-El, 545 U.S. at 240. "[W]e must defer to the [California Court of Appeal's] conclusion that there was no discrimination unless that finding was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Gaston, 2007 WL 5175191, at *1 (quoting Cook v. LaMarque, 593 F.3d 810, 816 (9th Cir. 2010)). A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." Rice, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that petitioner has not rebutted the presumption that the state court's conclusion was a reasonable one, see Miller-El, 545 U.S. at 240, as demonstrated by an analysis under the relevant case law. The Court need not dwell on the first step of the Batson analysis, whether petitioner made a prima facie case, because (a) the prosecutor offered racially-neutral explanations for striking Juror 3, and (b) the trial court ruled on the ultimate question of intentional discrimination. With respect to the second Batson step, the record does not support petitioner's assertion that the prosecutor's decision was based on constitutionally offensive considerations. As the state appellate court found, the prosecutor's stated reasons for the peremptory challenges were supported by the record. Juror 3 said repeatedly that there are "a lot of times women say no and they don't mean no," an indication that she may have decided

issues before being instructed on the law and reviewing the evidence of the case. As to the third Batson step which queries whether there was intentional discrimination, petitioner has not shown clear and convincing evidence to rebut the presumption that the trial court's determination was correct, or shown why this Court should favor petitioner's interpretation of the record over the trial court's credibility determination.

A comparative juror analysis, which was conducted by the state appellate court in its review of petitioner's claims and which petitioner urges this Court to engage in, further supports this conclusion. The record supports the state appellate court's conclusions that Juror 7 was not in truth similarly situated to Juror 3. Judging from the repetition and content of Juror 3's statement, the record supports the conclusion that Juror 3 strongly believes that in a great many cases, women do not mean "no" when they say it. As the state appellate court stated, this belief is distinguishable from that held by Juror 7, who gave a more equivocal and less broad response. Juror 7 first stated that she was not sure when "no" would not be sincerely stated ("I don't know"), and then said that there were a "lot of different circumstances" in which "no doesn't mean no." Whereas Juror 3 appears to believe that such circumstances occur "a lot," Juror 7 did not give an indication as to how often such occurrences transpire, but rather expressed the view that are many types of circumstances under which a woman's "no" is not sincere.

Other evidence supports a conclusion that the two jurors were not similarly situated. First, Juror 3, unlike Juror 7, showed a marked reluctance to serve on a jury, an occupation that Juror 3 stated would "just [be] interfering with my golf game." Second, Juror 3 was a retired non-professional with little education, and could not remember one of the two cases on which she previously served as a juror. This was in contrast to Juror 7 who was a fire captain paramedic who worked with a lot of police officers, and had served on two prior criminal juries. Taking all this into account, the Court concludes that petitioner has not shown that his constitutional rights were violated, or that the state appellate court's decision was anything other than "plainly not unreasonable." Jackson, 2011 WL 940865, at *3. At a

1  minimum, petitioner's claim must be denied because he has failed to show that there was "no
2  reasonable basis for the state court to deny relief," Harrington v. Richter, 131 S. Ct. 770, 784
3  (2011), that is, he has not shown that the state court's decision was contrary to, or involved
4  an unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C.
5  § 2254(d).  Accordingly, petitioner's claim is DENIED.

## II.	Motion for a New Trial

Petitioner claims that the trial court violated (A) his due process and (B) Fifth Amendment rights when it denied his motion for a mistrial.  (Pet., P. & A. at 10.)  More specifically, petitioner contends that his motion should have been granted because a witness testified that petitioner was on probation for burglary when he allegedly raped A.  (Id.)

The relevant facts are as follows.  At trial, police officer Yolanda Rocha testified for the prosecution regarding her interview of A.  In response to a question by the prosecutor ("Did A[.] tell you about any help she provided to [petitioner]?"), Rocha testified, "She said [petitioner] was on probation for burglary and she —."  Defense counsel objected, and the jury was excused.  Defense counsel moved for a mistrial on grounds that Rocha's statement violated petitioner's right against self-incrimination, detrimentally painted him as a convicted criminal, and its ill-effects could not be cured by way of a jury instruction.  The prosecutor told the court that she had admonished Rocha before she testified that she should not mention or refer to petitioner's probationary status because the trial court had ruled in a motion in limine that such information was inadmissible.[5]  In the prosecutor's opinion, the jury had not been tainted because it did not know whether the conviction was for a what degree of burglary, or for a felony or misdemeanor.  A detailed curative instruction, the prosecutor argued, would cure any ill-effects of Rocha's testimony.  Defense counsel argued against giving a detailed curative instruction immediately, believing that such an instruction would call greater attention to the statement, a statement that, according to defense counsel, had

---

[5] Under the trial court's ruling, the prosecution was allowed to introduce this evidence in the event petitioner testified.  (Ans., Ex. 6 at 25.)

caused two jurors to look at each other and roll their eyes. Defense counsel, however, agreed to the trial court's proposal to give CALCRIM No. 222 before closing arguments. (CALCRIM No. 222 contains the following admonition: "If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose.") After the jury returned to the courtroom, the trial court told it that "I'll be striking Officer Rocha's last statements before our break." The prosecutor resumed his examination. (Ans., Ex. 6 at 17–19.)

Defense counsel, outside the jury's presence, renewed his motion for a new trial after the prosecution had presented its case, a motion the trial court denied. After the jury returned,

> a juror asked: 'Just prior to the 2:00 o'clock break, did I understand that we were to disregard Officer Rocha's testimony?' The court responded: 'There was — just her last response there before we took a break. I did strike that from the record. You'll be disregarding that. Along with any other items that were stricken from the record as the witnesses testified. You won't be considering that for any purposes.'

The next day, petitioner told the court that he would testify because he felt compelled to do so after Rocha made her statement. Petitioner testified at trial that he had consensual sex with A., who never asked him to stop, and queried, "Why would I have raped her if we've already had sex in the past?" Petitioner also testified that he was indeed on probation for burglary at the time of the alleged offense, and that he had pleaded guilty to the burglary charge. Rocha, taking the stand on rebuttal, testified that petitioner told her that "he couldn't have raped her if they had already had sex in the past," but he did admit that A. had "tensed up her legs to prevent him from penetrating her." (Id. at 19–21.)

Prior to closing arguments, the trial court instructed the jury that it was to disregard and not consider for any purpose any testimony stricken by the court. After the verdicts were read, defense counsel moved for a new trial on grounds that Rocha's statement compelled petitioner to testify, thereby violating his Fifth Amendment right against self-incrimination. The trial court responded that alternatives to petitioner testifying had been available, and that

1  defense counsel in fact had rejected the court's offer of an immediate detailed curative
2  instruction.  (Id. at 21–22.)

3  Defense counsel and the prosecutor spoke to the jurors together after trial, and told the
4  trial court what they observed.  Defense counsel stated that the jurors "said they didn't
5  believe [petitioner's] testimony."  According to defense counsel, two jurors stated that had
6  petitioner not taken the stand, "that would have made this decision a lot more difficult."
7  According to the prosecutor, every juror, including the two just referenced, said that
8  petitioner's probation status or prior conviction were "not remotely a consideration."  The
9  trial court denied defense counsel's motion for a new trial.  (Id. at 22.)

### A.  Due Process

The state appellate court rejected petitioner's claim his due process right to a fair trial was violated when the trial court denied his motions for a new trial:

> Here, the information to which the jury was exposed was quite limited.  Rocha stated:  "[A.] said [petitioner] was on probation for burglary."  Rocha's testimony was immediately interrupted by an objection, and the jury was thereafter instructed that this testimony had been stricken and that it was to be disregarded.  Because Rocha did not state that [petitioner] was in fact on probation for burglary but only that A. had told her that [petitioner] was on probation for burglary, rational jurors who were instructed to disregard this testimony probably would have concluded that this information was simply inaccurate and would have disregarded it as instructed by the court.  As this case did not involve a burglary offense or anything similar, the nature of the prior offense was unlikely to affect the jury's view of the merits of this case.  While evidence that [petitioner] had been convicted of burglary certainly would tend to harm his credibility, [petitioner's] credibility was not at issue at the time the trial court denied the mistrial motion.  Rocha was the final prosecution witness, and no decision had been made on whether [petitioner] would testify on his own behalf.  The trial court had already ruled that the prosecution could properly introduce evidence of [petitioner's] burglary conviction if he chose to testify, so Rocha's stricken testimony could never have played any role in evaluating [petitioner's] credibility.

(Ans., Ex. 6 at 25.)

In order to succeed in his claim, petitioner must show that Rocha's statement was prejudicial, that is, that it had a substantial and injurious effect or influence in determining the jury's verdict.  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).  To this end, petitioner has not succeeded.  First,

Rocha's statement conveyed only that A. told her that petitioner was on probation for burglary. Rocha was not asserting that she (Rocha) had actual knowledge that petitioner was in fact on probation, only that A. had said that he was. Second, Rocha's testimony was interrupted immediately after her saying it, the jury was excused, and the trial court informed the jury immediately upon its return to court that Rocha's statement was stricken. This Court must presume that the juror's followed this instruction and the later instruction before closing arguments that it was to completely disregard any stricken statement. See Richardson v. Marsh, 481 U.S. 200, 206 (1987). Third, the jurors told the prosecutor and defense counsel that Rocha's statement played no role in their deliberations. Taking all this into account, the Court concludes that petitioner has not shown that his constitutional rights were violated. At a minimum, petitioner's claim must be denied because he has failed to show that there was "no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784, that is, he has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C. § 2254(d). Accordingly, petitioner's claim is DENIED.

### B.     Fifth Amendment

The state appellate court rejected for two reasons petitioner's claim that Rocha's statement compelled him to give up his Fifth Amendment right against self-incrimination. First, the state appellate court stated that it was reasonable for the trial court to conclude that a curative instruction would remedy the situation, an instruction that was in fact issued. By not conducting further curative efforts, the trial court was simply acceding to the defense's wishes. Petitioner's decision to waive his Fifth Amendment rights was, therefore, strategic, and not compelled. Second, the strategic decision to testify "plainly suggested that [petitioner] had calculated that his prospects for acquittal would be heightened if he provided the jury with his testimony contradicting A.'s account of the incident." If petitioner had not testified, the jury, according to the state appellate court, would have been faced with A.'s "uncontradicted testimony describing a forcible rape." (Ans., Ex. 6 at 26.)

The Self-Incrimination Clause of the Fifth Amendment provides that "'no person shall be compelled in any criminal proceeding to be a witness against himself.'" Neal v. Shimoda, 131 F.3d 818, 832 (9th Cir. 1997).

Petitioner's claims fails. Simply put, he has not shown that he was compelled to waive his right against self-incrimination because of Rocha's statement. The information Rocha provided was limited to the assertion that A. said that petitioner was on probation, the testimony was immediately stricken, follow-up instructions were given, Rocha's statement was not corroborated by the prosecution, and the defense declined the trial court's offer to give more detailed curative instructions. Considering that (1) he had the option of having a more detailed jury instruction, (2) the statement was in fact immediately stricken, and (3) and the jury was further advised at the close of evidence to disregard stricken testimony, petitioner has not shown that Rocha's statement compelled him to testify in his own defense. Indeed, had petitioner not testified, the jury would have been left with the uncorroborated, stricken (and certainly suspect) statement given by Rocha. By testifying, he confirmed for the jury the truth of the stricken statement, and drew more attention to its significance. Furthermore, by testifying, he was able to present evidence against A.'s otherwise uncontradicted testimony regarding the incident.

Additionally, case law supports a conclusion that by testifying petitioner waived his Fifth Amendment rights, thereby waiving any claims based on allegations that such rights were violated. Generally speaking, "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives." Harrison v. United States, 392 U.S. 219, 222 (1968). That waiver "is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." Id. The right is not waived, however, when a defendant's testimony is compelled by the need to counter evidence that was illegally obtained and improperly admitted. Id. This is not the situation the instant case presents. First, the prosecutor, contra Harrison, did not seek to

admit evidence that was illegally obtained.  The record indicates that Rocha's statement was not intentionally elicited by the prosecutor, who had instructed Rocha not to touch on the subject of petitioner's probationary status.  Second, Rocha's statement — uncorroborated, irrelevant to the rape charges, and stricken — presents nothing like the constitutionally offensive situation in Harrison, wherein confessions were illegally obtained.  Petitioner, then, has not shown that he had to testify to counter invidious evidence.  Third, petitioner's testimony, unlike that at issue in Harrison, confirmed, rather than rebutted, Rocha's statement.  On such a record, petitioner waived his Fifth Amendment rights, and, thereby any federal habeas claims based on allegations that such right was violated.

Furthermore, petitioner has not shown that he was prejudiced by such statement.  The jurors stated that Rocha's statement played no role in their deliberations, and by testifying that he was on probation, petitioner himself increased, rather than diminished, the invidious effect, if any, of Rocha's statement.  Petitioner asserts that this was "close case," as evidenced by the 14 hours of jury deliberations and the multiple jury requests for readings from the transcript.  Rocha's statement, petitioner avers, tipped the balance.  This assertion is not supported by the record or by case law.  Fourteen hours of deliberations over three days does not give rise to an inference that Rocha's statement tipped the balance, especially considering the gravity of the charges and strongly conflicting testimony.  Even if this were a suspect length of time, lengthy deliberations do not by themselves establish prejudice.  See United States v. Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001).  Also, petitioner cites nothing about the readbacks themselves that would support an inference of prejudice.  On such a record, petitioner has not shown that Rocha's statement had a substantial and injurious effect or influence in determining the jury's verdict.  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

In sum, petitioner's claim must be denied.  At a minimum, petitioner's claim must be denied because he has failed to show that there was "no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784, that is, he has not shown that the state court's

decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C. § 2254(d). Accordingly, petitioner's claim is DENIED.

**CONCLUSION**

The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Ninth Circuit.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

DATED: April _ 6 , 2011



CHARLES R. BREYER
United States District Judge